George M. **COX** et al., Appellants,

v.

**GENERAL MOTORS CORPORATION,**
Appellee.

Court of Appeals of Kentucky.

Sept. 27, 1974.

J. T. Hatcher, Hatcher, Lewis & Bland, Elizabethtown, for appellants.

Woodward, Hobson & Fulton, Louisville, Hobson L. James, Elizabethtown, for appellee.

CATINNA, Commissioner.

George Cox, Manfred Cox, and Bobby Ray Fullerton were injured when the rear wheel broke off an automobile being operated by Jerry R. Brown. The wheel rolled down and across the median of the divid-

ed-lane highway and struck the Fullerton automobile. Fullerton and Cox filed actions against Jerry R. Brown and by subsequent amendment made General Motors Corporation a defendant on the ground that the Chevrolet automobile being operated by Brown had been so defectively constructed that the studs affixing the rear wheel to the axle broke.

The cases were consolidated for the purpose of trial, and at the conclusion of the plaintiffs' evidence, the court directed the jury to return a verdict for the defendant, General Motors Corporation. Fullerton and Cox appeal.

Fullerton and Cox propound the following question on this appeal:

"When a wheel comes off a car because the studs broke and there is expert testimony that the studs were too small to withstand the thrust of the engine, is there sufficient evidence against the manufacturer to present a jury question on the cause of an accident resulting therefrom?"

They claim that the evidence introduced by them was sufficient to present a jury question under the doctrine of strict liability.

The automobile being driven by Brown at the time of the accident, April 13, 1969, was a 1968 Chevrolet Chevelle SS 396. When this model was assembled, it was equipped with fourteen-inch wheels and tires. This Chevrolet was purchased on January 9, 1968, by a Ronald M. Eller of Muncie, Indiana. After Eller acquired it, he made the following modifications: removed the wheels that came as standard equipment on the car and installed what was known as chrome-reverse wheels which took a larger and wider tire than those that came as part of the original equipment; installed new chrome-plated lugs to go with the wheels; modified the muffler system by installing headers, the purpose of which was to let the exhaust out faster and make the engine more powerful and increase its performance; put on a different bell housing in order to protect the driver from flying parts of the transmission should it disintegrate in the course of a drag race; and installed a different type pressure plate which in some way affected the performance of the clutch. A tachometer was also installed, but it is not clear whether Eller or Brown made this addition.

While Eller owned the Chevrolet he drag raced upon occasions at the Muncie Dragway. When the Chevrolet was being raced, wheels and tires that provided better traction and "get away" were installed. The chrome-reverse wheels and lugs installed by Eller were not Chevrolet equipment, nor were these items manufactured by General Motors. After Eller had driven the car approximately 9,000 miles, he sold it to Jerry Brown. Brown purchased two secondhand, standard, fifteen-inch rear wheels for the Chevrolet. It is not shown whether these wheels were manufactured for a Chevrolet automobile, a Cadillac, or a G.M. pick-up truck. The initials "GM" were stamped on the wheels, and Brown concluded from this that they were a General Motors product. Brown also bought four new tires for the car. The fifteen-inch wheels were attached to the rear axle with new chrome acorn-style lug nuts purchased at the same time. These lug nuts were not a General Motors product. The secondhand fifteen-inch wheels replaced the fourteen-inch wheels which were standard equipment for this automobile.

Brown brought the Chevrolet to Kentucky and drag raced it at a strip near Radcliff. When Brown drag raced, he replaced the rear wheels with wheels equipped with tires known as racing slicks or "cheaters." These tires were much larger and did not spin when the car was suddenly accelerated. When Brown raced he would speed the motor up to 3,000 to 3,200 revolutions per minute, engage the clutch upon signal, and in a distance of ⅛ of a mile attain a speed in excess of eighty miles per hour.

During all the time that Eller and Brown had the car the studs (bolts) which

held the wheels to the axle housing were not changed and, according to the evidence, were 7/16 of an inch in diameter. However, the lugs (nuts) were changed on numerous occasions. At the time of the accident the Chevrolet was equipped with the two secondhand fifteen-inch wheels purchased from a used-parts dealer in Muncie, Indiana. Brown testified that he felt the car lurch or bump and then go into a spin, and he looked up and noticed that the wheel had rolled across the median into the path of the oncoming Fullerton automobile. Brown stated that the accident happened because the five studs that held the wheel to the axle housing sheared or broke. Three of the broken studs were recovered; however, the other two disappeared.

■ Brown testified that he was a mechanic and that in his opinion the 7/16 inch studs were too small to withstand the force exerted upon them by the engine and power train in the Chevrolet. He admitted that he did not know the horsepower of the engine but estimated it to be between 350 to 375 horsepower. He said he had no experience in the design of automobiles nor did he have any knowledge of metallurgy and the type or tensile strength of the steel used in the studs, nor did he know the torque produced by the force of the engine. He acquired the Chevrolet in November or December of 1968 and operated it until April 1969. He testified that he had changed the wheels on numerous occasions and had observed nothing that would indicate that the studs were not adequate. Brown's opinion has no real value for it does not take into consideration any of the aspects of design which are essential for a determination of the adequacy of the equipment or whether it was defective to such an extent as to render General Motors liable.

Two local mechanics of long experience testified as experts on behalf of Brown. W. L. Willer, who devotes most of his time to the repairing of heavy equipment, stated that in his opinion the size of the studs

was not sufficient to withstand the use for which they had been designed. Although Miller gave this as an expert opinion, he admitted that he did not know the type of material used in the 1968 Chevelle studs, whether it had been tempered or heat treated, or the tensile strength of that material. He examined the broken studs and was unable to identify the type of fracture involved. He was unable to say why the wheel came off. He admitted to the court that he had no knowledge of the torque of the engine, that he did not know its horsepower, or its compression ratio.

Considering these unknowns, we conclude that the expert opinion of Miller is absolutely valueless and does not justify the submission of the question of liability to a jury.

Tom Hellard testified that in his opinion the studs broke because they were not really big enough to take care of the horsepower of the engine and the low gear ratio in the rear end. However, he admitted that he did not know what kind of steel had been used in the manufacture of the studs, and as some steel was much stronger than others, it would take more power or thrust or torque to shear studs made of this particular type steel. Hellard also admitted that he had no knowledge of the tensile strength of the steel used and did not know the torque delivered to the transmission. His opinion, therefore, was not based upon proper facts or knowledge. It was of the rankest speculation and did not have sufficient probative value to permit the submission of the case to a jury.

■ Even though it might be admitted, for the sake of argument, that the studs were too small for the use to which Brown had put the Chevrolet, we are confronted by the fact that after this automobile had been sold the two owners, Eller and Brown, made substantial alterations to the automobile. Equipment was installed which had not been designed by General Motors for this particular model. We are further confronted by a situation where the auto-

mobile was used in a manner and under conditions which in themselves may have been a substantial factor leading to the eventual shearing of the studs. It is not every owner of an automobile who mistreats his car to the extent of drag racing by revving up the motor to some 3,200 revolutions per minute, engaging the clutch on signal, and attaining a speed of eighty miles per hour in the very short distance of ⅛ of a mile. This, in itself, puts an inordinate strain upon all the equipment found on an automobile as is indicated by the fact that Eller put a new bell housing in the car so that pieces of the transmission wouldn't fly up in his face if it should explode during the race.

Restatement of Torts, 2d, Section 402A, provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

\* \* \* \* \* \*

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold."

Comments concerning the application of this rule state that a product is not in a defective condition when it is safe for normal handling and consumption and, further, a seller is not liable when he delivered the product in a safe condition and subsequent mishandling or other causes made it harmful by the time it was consumed. The evidence conclusively shows that the automobile being driven by Brown had been badly mishandled, as well as modified. It was necessary for the parties to introduce evidence that the wheel came off the automobile as a proximate result of a design defect and not as a result of the subsequent mishandling and modification.

Prosser on Torts, Section 103, page 674, sets out the general rule as follows:

"Tracing the defect in the product into the hands of the defendant confronts the plaintiff with greater difficulties. There is first of all the question of lapse of time and long continued use. This in itself will never prevent recovery where there is satisfactory proof of an original defect; but when there is no such definite evidence, and it is only a matter of inference from the fact that something broke or gave way, the continued use usually prevents the inference that more probably than not the product was defective when it was sold. It has been said many times that the seller does not undertake to provide a product that will not wear out. \* \* \*."

Cf. Briner v. General Motors Corporation, Ky., 461 S.W.2d 99 (1971).

■ The evidence in this record fails to establish that there was an original defect in the automobile owned by Brown. When we consider that this car had been used from January 2, 1968, until April 13, 1969, and driven in excess of 23,000 miles, including many miles of drag-strip racing, and the further fact that numerous modifications had been made, we must conclude that the continued use of the car in the manner described and its mistreatment by the owners constituted such misconduct and misuse as to contribute substantially to the accident. The evidence did not establish a submissible case.

The judgment is affirmed.

OSBORNE, C. J., and JONES, MILLIKEN, PALMORE, STEINFELD, and STEPHENSON, JJ., concur.

REED, J., not sitting.