**C & S FUEL, INC., Plaintiff,**

v.

**CLARK EQUIPMENT COMPANY, Defendant.**

**Civ. A. No. 79–40.**

United States District Court,
E.D. Kentucky,
London Division.

Nov. 24, 1982.

the pleadings.

John M. Choplin, II, Peter A. Schroeder, Norris, Choplin & Johnson, Indianapolis, Ind., for plaintiff.

H. Gregory Haynes, Edgar A. Zingman, Wyatt, Tarrant & Combs, Louisville, Ky., for defendant.

*Memorandum Opinion*

BERTELSMAN, District Judge.

## FINDINGS OF FACT

This is a diversity case brought by C & S Fuel, Incorporated, against Clark Equipment Company. It was tried before the court sitting without a jury. Jurisdiction is based on 28 U.S.C. § 1332. This suit was brought to recover the value of a Michigan 475B tractor shovel that was destroyed by fire. The tractor was manufactured by Clark and owned by C & S. It had passed through the intermediate ownership of two or three other entities. In this products liability action, C & S asserts that the tractor was defectively designed and that the design defect proximately caused the fire that consumed the machine. So that the reader may visualize the machine, a drawing is appended. To further orient the reader, it should be noted that the wheels of the machine are 12 feet in diameter, and the cab is 14 feet off the ground.

On March 16, 1977, the C & S 475B tractor caught on fire while it was being used to move overburden in a strip mining operation. The operator testifies that his attention was suddenly attracted to the rear. Turning, he saw flames shooting into the air. Understandably, he hastily abandoned the machine without shutting off the engine. Plaintiff claims ignition occurred when hydraulic fluid leaking from a pump or hose was drawn or sprayed onto hot engine parts. The theory is that the flame followed the fluid back to its source between the cab and engine. From this point, it is asserted, the fire emanated rearward and upward completely destroying the machine.

Plaintiff claims that the design of the 475B tractor was defective in that it permitted leaking fluid from a ruptured high-pressure hydraulic hose or pump to spray or to be drawn by the tractor's airflow into the engine compartment where it could contact ignition sources. Hydraulic fluid used in 475B tractors is combustible at 370 degrees to 400 degrees Fahrenheit, and the exhaust manifolds and turbo charger jackets in the engine reach temperatures of 900 degrees Fahrenheit. Unfortunately, hydraulic systems leak as a matter of course, regardless of how well maintained. Clark employees state that they have discovered leaks in approximately one-half the machines they have observed operating in the

field. Therefore, the crux of plaintiff's claim is that there was insufficient separation or shielding of the hydraulic lines from the engine.

A deflector plate is located at the rear of the engine and forms a partial barrier between the hydraulic system and the engine. The purpose of this plate is two-fold. It reduces noise in the cab and prevents leaking hydraulic fluid from entering the engine compartment. Because the deflector plate does not extend completely to the bottom of the engine compartment and contains several openings, it does not, nor was it intended to, provide a complete barrier. The plate, however, provides a marginal safety factor. This minimal amount of protection was reduced by a modification to the shield made after Clark sold the tractor. A semi-circular cut from the bottom of the plate (approximately 25 percent of its area) was removed by persons unknown. The cut-out allowed leaking fluid to spray or spurt more directly on ignition sources in the engine, thus heightening the risk of fire. Plaintiff argues that this cut in the deflector plate was a foreseeable alteration, but the court finds that it was not.

In mid-1975, Clark formed a "task force" to investigate reports of fires in 475B tractors. An unacceptable number of 475B tractors had burned. The "task force" tried to discover the cause of the fires. Accordingly, tests were conducted in 1976 and 1977. These tests showed that 475B tractor airflow came over the hydraulic lines and pumps and into the engine. Even though Clark employees realized this was a dangerous condition necessitating a change, no warning was given to 475B tractor dealers or owners. Instead, Clark experimented with corrective modifications and decided to put sleeves around the hydraulic lines in all new 475B tractors. In 1979, Clark notified dealers that the sleeve modification was available for installation on used tractors at dealer or owner's cost. Subsequently, Clark substituted stronger hoses for the sleeve modification.

On the basis of the evidence summarized above, the court finds the following ultimate facts.

1. Because of the marginal safety factor for preventing fires from hydraulic leaks, an ordinarily prudent company engaged in the manufacture of tractor shovels, being fully aware of the risk, would not have put the model 475B shovel on the market.

2. Based on knowledge actually available in the exercise of ordinary care at the time of manufacture, it was not a violation of ordinary prudence to market the shovel.

3. The modification of the deflector plate constituted a substantial change in the condition of the product, which was not foreseeable.

4. The court makes no finding concerning whether the fire was actually caused by a hydraulic leak because, even if it were, plaintiff has failed to meet its burden of proving the design defect was a substantial factor in causing the fire.

The legal ramifications of these findings are hereinafter discussed. Additional findings of fact are also contained in that discussion.[1]

## CONCLUSIONS OF LAW

### Strict Liability and Negligence

█ As forecast in its pleadings, plaintiff proceeded on a double-barreled theory of strict liability and negligence. Under Kentucky law, these theories are closely related, but are distinguished by at least one critical difference. This difference is that, under the strict liability theory, a supplier or manufacturer is in effect charged with hindsight. That is, it is legally responsible for risks which could not have been known or appreciated at the time of manufacture, but came to light later, either before or after the accident complained of. This is not true in a negligence case, where the issues turn

---

1. Further facts and background may be found in an opinion denying a motion for summary judgment written by Judge Siler of this district, to whom the case was previously assigned. *C & S Fuel, Inc. v. Clark Equipment Co.*, 524 F.Supp. 949 (E.D.Ky.1981).

on what the manufacturer knew or should have known at the time of distribution.

That this is the law of Kentucky is apparent from a close reading of *Nichols v. Union Underwear Co.*:

> "In *Ulrich v. Kasco Abrasives Company*, Ky., 532 S.W.2d 197, 200 (1976), we pointed out that the inquiry is to be made from the perspective of a 'prudent manufacturer of similar products fully apprised of the condition and tendencies of the product when he put it into the stream of commerce . . . .' This is because strict liability *makes unnecessary proof by the plaintiff of what a prudent manufacturer exercising ordinary care actually should have discovered and foreseen as in a negligence action.* This idea is inherent in the concept of defectiveness.
>
> > Dean John Wade and Dean Page Keeton have provided the most widely adopted definition of defectiveness as it applies to strict products liability. The strict liability standard is no different from that of negligence, they say, except that *the seller is presumed to have knowledge of the actual condition of the product when it leaves his hands. In other words, as long as the product is shown to be in a defective condition when sold, the plaintiff need not go further and prove that the seller either knew or should have known of the defect.*
>
> Phillips, *The Standard for Determining Defectiveness in Products Liability*, 46 U.Cin.L.Rev. 101, 103 (1977)."[2]

Frequently, the "hindsight" factor is not a major consideration in the decision of a case because subsequent knowledge of risks inherent in the design of a product is not in issue. In the present case, however, this factor is crucial.

■ The evidence dispositive of the negligence question shows that all manufacturers of similar earth-moving equipment used essentially the same design. The plaintiff introduced no evidence to indicate that the defendant did not act in an ordinarily prudent manner in distributing the product in light of the state of the art at the time of manufacture. Plaintiff's tractor was sold by the defendant on July 22, 1975. The risks became apparent only later when a series of fires occurred in the field in this model and, as a result, the defendant organized a task force to conduct experiments to discover the cause.[3] The defendant's later experiments revealed that airflow traveled over the tractors' hydraulic pumps and lines on its way to the engine, raising the possibility that leaking hydraulic fluid might be drawn by the airflow into contact with engine parts hot enough to cause ignition. In response to questions by the court, at trial, defendant's own product safety coordinator admitted that the experiments conducted by the task force disclosed a dangerous condition which the defendant then corrected, at first, by enclosing the hydraulic hoses in sleeves and then by using a heavier hose. These experiments were completed in 1977.

■ Thus, plaintiff failed to meet its burden of proof on its negligence theory because it was not demonstrated that defendant knew or should have known of the defective condition in 1975 at the time of distribution. On the other hand, the court holds that the tractor was defective in design under a strict liability standard. To establish a design defect, it must be shown that, had the defendant been "fully aware of the risk,"[4] it would not in the exercise of ordinary care have put the machine on the market.[5] The design of the 475B tractor

---

**2.** 602 S.W.2d 429, 433 (Ky.1980) (emphasis added).

**3.** Repeated accidents associated with a particular product may raise an issue of defectiveness if the risk can feasibly be eliminated. Phillips, *The Standard for Determining Defectiveness in Products Liability*, 46 U.Cin.L.Rev. 101, 110 (1977). *Cf. Rhodes v. Michelin Tire Corp.*, 542 F.Supp. 60 (E.D.Ky.1982).

**4.** *Nichols v. Union Underwear Co.*, 602 S.W.2d at 433.

**5.** In a case involving an identically designed machine, Judge Allen of the Western District of Kentucky held that this model tractor was defectively designed in the respect complained of here. *Rudd Const. Equip. Co. v. Clark Equipment Co.*, No. 79–0314 L(A) (W.D.Ky. March 30, 1982). However, the machine in that case

was defective because inadequate precautions were taken to prevent leaking hydraulic fluid from being sprayed or drawn onto hot engine parts. A prudent manufacturer would not have distributed the tractor had it appreciated the risk of placing the high-pressure hydraulic system, which invariably leaks, in the path of engine airflow, a condition disclosed to Clark by its 1976–77 experiments.

Although the 475B tractor was defective in design, however, plaintiff's strict liability claim fails because it did not prove that the modification of the tractor's deflector plate was insubstantial.

### Substantial Change

*Restatement, Second,* Torts § 402A prescribes as a condition precedent to its application that the product "reach the user or consumer without substantial change in the condition in which it is sold." [6] Quite surprisingly, there are very few cases interpreting this provision. Its application, however, is the critical issue in the case at bar.

■ Plaintiff's principal complaint concerning the design of the tractor in question was that insufficient precautions were taken to prevent hydraulic fluid, spurting or spraying from a leaking hose, from entering the engine compartment and coming in contact with parts of the engine sufficiently hot to cause ignition. Yet, either the plain-

tiff or some previous owner of the machine cut away a portion of the deflector plate between the engine and the hydraulic system. Although the deflector plate did not provide total separation or completely adequate protection, it did provide some. The question reduces to whether this admitted alteration was so substantial a change in the defendant's design as to insulate the defendant from the strict liability principles of *Restatement* § 402A.

The question is certainly not without difficulty. Nevertheless, the court holds that the alteration did amount to a substantial change and that the plaintiff's case must fail. As has been pointed out above, there is a dearth of authority on this question. Much assistance, however, is found in the opinion of Judge Becker [7] in *Southwire Co. v. Beloit Eastern Corp.*[8] Judge Becker points out that there are three possible ways to apply the principle of "substantial change" of § 402A. One of these alternatives requires that the substantial change, in order to be an insulating factor when there is a defective design to begin with, be the sole proximate cause of the accident; another alternative requires it to be a superseding cause.[9]

■ Although Judge Becker did not find it necessary to determine which alternative applied in *Southwire,* this court holds that policy considerations dictate the choice of his remaining alternative:

> (2) The rule stated in Subsection (1) applies although
>> (a) the seller has exercised all possible care in the preparation and sale of his product, and
>> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller" (emphasis added).

Kentucky courts have adopted § 402A. *E.g., Cox v. General Motors Corp.,* 514 S.W.2d 197, 200 (Ky.1974).

---

was almost new, and there was no modification.

**6.** *Restatement, Second,* Torts § 402A reads in its entirety:

> "Special Liability of Seller of Product for Physical Harm to User or Consumer
> (1) *One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if*
>> (a) the seller is engaged in the business of selling such a product, and
>> (b) *it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.*

**7.** Now of the United States Court of Appeals for the Third Circuit.

**8.** 370 F.Supp. 842, 856–58 (E.D.Pa.1974).

**9.** *Id.* at 857 n.21.

"A substantial change which negates § 402A liability may well be posited as something less significant than an intervening superseding case [sic]. The rationale behind this argument is as follows. Since a defendant in a § 402A action can be held liable without proof of any fault on his part, this broad liability should not be imposed on a faultless defendant unless the plaintiff can prove a chain of causation linking the defendant's defective product to plaintiff's injury without substantial changes that may be less significant than intervening superseding causes needed to negate the liability of a negligent defendant." [10]

In other words, having imposed on defendant the onerous burden of strict liability for risks it could not have anticipated, the courts should give the defendant the benefit of a doubt where the design it did provide has been tampered with in a significant way. The policy underlying this approach is that a supplier should be strictly liable only for its own design, not for someone else's.

This same approach, stated in a slightly different manner, may be found in another decision that this court finds highly persuasive. This is the decision of the Appellate Court of Indiana in *Cornette v. Searjeant Metal Products, Inc.*[11] This court accepts, and believes that the Kentucky courts would accept, the following definition of substantial change adopted in *Cornette:*

"We would point out that *any* change which increases the likelihood of a malfunction, which is the proximate cause of the harm complained of, and which is independent of the expected and intended use to which the product is put, is a *substantial* change." [12]

It may be seen in the quotations from *Cornette* and *Southwire* that the "substantial alteration" problem is closely related to proximate cause doctrines.[13] Moreover, all authorities that have addressed the subject agree that the burden of proof (in the sense of the risk of non-persuasion) that there was no substantial change is on the plaintiff.[14]

The 475B tractor was defective because the deflector plate was only marginally sufficient to prevent leaking hydraulic fluid from entering the engine compartment. Because hydraulic leaks are quite common, it is obvious that not every hydraulic leak in a 475B tractor resulted in a fire.[15] The court concludes that this was because of the marginal safety provided by the deflector plate. But the marginal amount of protection provided by the deflector plate was even further reduced by the cut-out alteration. The plaintiff has failed to persuade the court that the cut-out in the deflector plate, which undoubtedly increased the likelihood of the risk of fire and which undoubtedly was independent of the expected use to which the product was to be put, was not the proximate cause of the fire that destroyed plaintiff's tractor. Thus, under the rule of *Cornette,* the change must be held to be substantial, defeating plaintiff's strict liability claim.

■ One point remains to be clarified. Although the court holds that the burden of

10. *Id.*

11. 147 Ind.App. 46, 258 N.E.2d 652 (1970). It should be noted in connection with this decision that this court does not necessarily agree that in all circumstances § 402A should be "strictly construed and narrowly applied." *See* 258 N.E.2d at 657.

12. 258 N.E.2d at 657 (emphasis in original).

13. *See also Cox v. General Motors Corp.,* 514 S.W.2d at 200.

14. *See Page v. Barko Hydraulics,* 673 F.2d 134, 138 (5th Cir.1982); *Southwire Co. v. Beloit Eastern Corp.,* 370 F.Supp. at 857–58; *Smith v. Verson Allsteel Press Co.,* 74 Ill.App.3d 818, 30 Ill.Dec. 562, 393 N.E.2d 598, 604 (1979); *Cornette v. Searjeant Metal Products, Inc.,* 258 N.E.2d at 657; *Cox v. General Motors Corp.,* 514 S.W.2d at 200.

15. Less than five percent of the 475 model tractors produced have burned.

proof in the sense of the risk of non-persuasion on the issue of substantial change is on the plaintiff, the court believes that the view expressed by Judge Becker in *Southwire,* that efficient judicial economy requires that the burden of going forward with the evidence be on the defendant, is sound.[16] Here, the defendant met that burden of proof.

### Duty to Warn

■ Plaintiff's final argument is that Clark is liable because it negligently failed to warn the plaintiff of the product's dangerous fire propensities. In products liability law, the duty to warn may arise in either of two contexts, which frequently overlap in particular cases. The first is related to the concept of design defect. A product may be unreasonably dangerous in design, unless accompanied by a warning that it should not be put to a certain use. For example, a drug might be dangerous to a small percentage of the population with unusually high blood pressure. In such a situation, it might be unreasonably dangerous to market the product without a warning, and the design of the product would be defective if it were marketed in that manner. But it would not be unreasonably dangerous to market the product with a warning that it should not be used by persons with high blood pressure. Thus, it might be said that the manufacturer was under a "duty to warn" of the risk. A duty to warn of this type may be considered as part of the strict liability doctrine of "design defect." A manufacturer would be charged with "hindsight," as discussed above, with regard to it.[17]

To phrase this concept slightly differently, the fundamental duty is to market a product that is reasonably safe. Because the warning can make the product reasonably safe without in any way changing it, it may be said that there is a duty to provide a warning as part of a reasonably safe design.

■ A supplier of a product may also have a duty to warn arising out of general negligence principles. This proposition is expressed in *Restatement Second,* Torts § 388:

> "Chattel Known to be Dangerous for Intended Use
>
> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous." [18]

As to a duty arising out of ordinary care, of course, a supplier *would be charged only* with knowledge available at the time of distribution, as has been discussed above.

■ Applying these principles to the instant case, it is evident that the strict liability duty to warn either has already served its purpose or has no relevance. It has already served its purpose because lack of adequate warning in a strict liability context is used to prove that a product is defective. This court has determined that

**16.** *Southwire Co. v. Beloit Eastern Corp.,* 370 F.Supp. at 857.

**17.** Phillips, *supra* note 3, at 106.

**18.** *Restatement, Second,* Torts § 388. In the leading Kentucky warnings case, *Post v. Amer-*

*ican Cleaning Equipment Corp.,* 437 S.W.2d 516 (Ky.1969), the two types of duties to warn overlapped. *See also Dowdell v. U.S. Industries, Inc.,* 495 F.2d 641 (6th Cir.1974) (applying Ohio law on negligence).

the 475B tractor was defective. The strict liability duty to warn has no relevance because no warnings could have rendered the 475B tractor safe. In any event, plaintiff's strict liability case failed because of the substantial change doctrine already discussed.

■ Plaintiff's case also fails on a duty to warn under negligence principles. This court is not persuaded that the defendant knew or should have known of its tractors' defective and dangerous condition in time to warn the plaintiff prior to the destruction of plaintiff's tractor on March 16, 1977.[19] Consequently, Clark cannot be liable on a theory of failure to warn. Therefore, the court makes no ruling as to whether Clark would have had any duty to warn the plaintiff under the circumstances if it had had timely knowledge of the risk.[20]

## CONCLUSION

Although the plaintiff has convinced the court that there was a design defect in the defendant's tractor shovel, its case fails because plaintiff cannot avail itself of the theories of strict liability or negligence. The defendant cannot be held liable under a strict liability theory because a substantial change was made in the condition of the tractor after it was sold. The defendant cannot be held liable under a negligence theory because it was not shown that the defendant knew or should have known of the design defect prior to the sale of the tractor or prior to the fire.

Therefore, judgment is entered for the defendant. A separate judgment dismissing the complaint is entered concurrently herewith.

19. When Clark formed its task force in mid-1975 to investigate fires in 475B tractors, it knew that an unacceptable number of its tractors had burned, but it was not aware of the cause of the fires or if the fires were related to a characteristic of its 475B tractors. Only three or four percent of Clark's 475 model tractors had been involved in fires. To Clark, this was a disturbing incidence of fires. This number, however, was not large enough to cause it to conclude that the 475B tractor itself was defective and dangerous. It is true that Clark received reports of hydraulically-related fires, but these reports were so few in number and limited in information as to be inadequate to form the basis for a duty to warn all Clark tractor owners that the 475B was defective.

In any event, Clark's task force proceeded to investigate fire reports and tried to determine the cause of fires. To this end, the aforementioned airflow tests were conducted from around September 14, 1976, to March 15, 1977. It was only after these tests were completed and evaluated that Clark engineers realized the dangers of the 475B tractor design. Clearly, this knowledge came too late to notify plaintiff of the design defect at a time when it would have mattered. After all, plaintiff's tractor burned on March 16, 1977, one day after the final airflow tests were completed.

Furthermore, this court cannot find that the defendant should have known of the danger sufficiently prior to March 16, 1977, to have given adequate warnings. Apparently, airflow tests were conducted because some Clark employees theorized that leaking hydraulic oil might atomize (reduce to fine particles) and then be carried by air drafts to ignition sources in the engine. Airflow was only material if leaking hydraulic oil atomized. That oil atomizes was disputed at trial. Because the theory of oil atomization was speculative, this court cannot find that Clark should have conducted airflow tests at an earlier date or that Clark should have comprehended the danger after the first airflow tests were finished. Thus, although plaintiff has made credible legal and factual arguments, the court finds that defendant is not liable for failure to warn of the design defect in 475B tractors. A preponderance of the facts simply does not support a finding that Clark knew or should have known of the design defect prior to the fire plaintiff complained of or at a time when warnings could have been disseminated and could have affected that fire.

20. That is, the court makes no holding that the Kentucky courts would or would not adopt the principles of *Braniff Airways, Inc. v. Curtiss-Wright Corporation,* 411 F.2d 451, 453 (2d Cir. 1969), that there is a continuing duty to warn after sale.