**FORD MOTOR COMPANY, Appellant,**

v.

**David Lee McCAMISH and Hesco Parts Corporation, Appellees.**

**David Lee McCAMISH, Cross-Appellant,**

v.

**FORD MOTOR COMPANY, Cross-Appellee.**

Court of Appeals of Kentucky.

Dec. 9, 1977.

508

Clarence McCarroll, Bartlett, McCarroll & Nunley, Owensboro, for appellant Ford Motor Co.

Frederick C. Dolt, Louisville, for appellee David Lee McCamish.

R. Scott Plain, Owensboro, for appellee Hesco Parts Corp.

Before GANT, PARK and VANCE, JJ.

PARK, Judge.

The plaintiff-appellee, David Lee McCamish, sustained severe personal injuries on October 4, 1968, when the brakes failed on an F–600 Ford Truck which he was operating for his employer, Howard Allgood. The truck had been manufactured by the defendant-appellant, Ford Motor Company, and the brake system had been

repaired shortly before the accident by an authorized Ford dealer Blancett Motor Company. Upon a trial of McCamish's action for personal injuries, the jury returned a verdict for McCamish against Ford Motor Company and Blancett Motor Company in the total sum of $129,415.00. The jury apportioned the verdict between Ford and Blancett on the basis of 30% against Ford ($38,824.50) and 70% against Blancett ($90,590.50).

Blancett Motor Company filed an appeal (No. 75–592), and McCamish filed a cross-appeal against Blancett and Ford (No. 75–622). Subsequently, McCamish's claim against Blancett was settled, and the appeal of Blancett and cross-appeal of McCamish against Blancett were dismissed. Consequently, the only issues remaining before this court are those raised by the appeal of Ford Motor Company (No. 75–593) and the cross-appeal by McCamish against Ford Motor Company.

## ISSUES

■ The Ford Motor Company asserts that the trial court erred in failing to sustain its motion for a directed verdict and its motion for a judgment notwithstanding the verdict. McCamish replies that two jury issues were created by the evidence: (1) whether the brakes of the truck were unreasonably dangerous at the time it was sold by Ford Motor Company, and (2) whether Ford Motor Company failed to give proper instructions to Blancett Motor Company for the repair of brakes on that model truck. McCamish also claims that Ford Motor Company is responsible for any defects in a re-built brake shoe sold by the defendant-appellee, Hesco Parts Corporation. The jury returned a verdict for Hesco. Consequently, there can be no merit to this assertion by McCamish even if there were some theory under which Ford Motor Company could be held responsible for the negligence or fault of Hesco Parts Corporation.

McCamish's action was commenced in the Breckinridge Circuit Court. When the case was first tried in that court, the jury returned a verdict in favor of McCamish solely against Ford Motor Company in the sum of $66,203.00. The trial court sustained motions for a new trial, and the case was transferred to the Meade Circuit Court for the second trial. On his cross-appeal, McCamish claims that the original verdict should be reinstated in the event that the judgment entered following the second trial is reversed. He also questions the jury's apportionment of the verdict.

## WAS THE TRUCK IN AN UNREASONABLY DANGEROUS CONDITION AT THE TIME IT WAS SOLD BY FORD MOTOR COMPANY?

■ The accident in which McCamish was injured occurred when the brakes failed as he was descending a long hill with a full load of hot asphalt. When the brakes failed, McCamish was forced to take the truck off the road in order to avoid other traffic. McCamish asserts that Ford Motor Company is subject to strict liability on the basis of section 402A of the *Restatement (Second) of Torts*, which was adopted by the court in *Dealers Transport Co. v. Battery Distributing Co.*, Ky., 402 S.W.2d 441, 446–47 (1966). Under section 402A, Ford Motor Company would be liable if the brakes on the truck were unreasonably dangerous at the time of the sale of the truck. If the brakes were unreasonably dangerous, it is immaterial whether they were dangerous because of defective design or because of an error in the process of manufacture or assembly. *Ulrich v. Kasco Abrasives Co.*, Ky., 532 S.W.2d 197, 200 (1976).

The brakes on the truck were admittedly defective and unreasonably dangerous at the time of the accident. Therefore, the crucial question is whether McCamish's proof established a reasonable probability that the dangerous condition of the brakes existed at the time of sale and delivery of the truck. *Briner v. General Motors Corp.*, Ky., 461 S.W.2d 99, 103 (1970); *Restatement (Second) of Torts* § 402A, Comment *g*.

The F–600 truck in question was a 1963 model which Allgood had purchased as a new vehicle. The record fails to reflect

how many miles the truck had been driven at the time of the accident in 1968. However, the truck was being driven approximately 220 miles each day during the period preceding the accident.

The truck was equipped with a hydraulic brake system. With such a system, pressure on the brake pedal activates the master brake cylinder which transmits hydraulic pressure to each of the individual wheel cylinders. The two pistons within each wheel cylinder are connected to the brake shoes by means of push rods. When hydraulic pressure is transmitted to each individual wheel cylinder, the wheel cylinder pistons push the brake shoes out against the inside of the brake drum.

Each wheel cylinder is attached by two bolts to a backing plate which in turn is bolted to the axle housing. Each backing plate carries two wheel cylinders, an upper and a lower. The two wheel cylinders are connected by the push rods to two brake shoes which face to the front and rear respectively.

On Friday, September 27, 1968, McCamish reported to his employer, Allgood, that the truck had a broken lug nut. That evening, Allgood was replacing the lug bolt on the truck when he noticed that the brake linings were worn out. On Saturday morning, September 28, Allgood took the truck to Blancett Motor Company for a full "brake job." The brakes were relined by installing new brake shoes. One wheel cylinder was replaced, and five wheel cylinders were rebuilt by using new parts from wheel cylinder kits. The truck was returned to Allgood late Saturday.

When Allgood was greasing the truck and changing the oil the next day, he discovered that brake fluid was leaking onto the right rear brake drum. On Monday, September 30, Allgood returned the truck to Blancett. Employees of Blancett discovered that fluid was leaking from the lower wheel cylinder attached to the right rear backing plate. Because this wheel cylinder had been replaced or rebuilt on Saturday, it was removed from the backing plate for closer examination. No defect being found

in the cylinder itself, a new wheel cylinder kit was installed, and the rebuilt wheel cylinder was rebolted to the backing plate. The truck was returned to Allgood that day, and on Tuesday, October 1, McCamish again began driving the truck.

McCamish operated the truck without incident until Friday, October 4, 1968. As he was descending a long steep hill, another truck stopped for on-coming traffic before making a left turn. McCamish applied the brakes which held for a few moments. Then there was a sudden loss of brake pressure, the brake pedal dropping to the floorboard. Following the accident, it was discovered that the pistons had come out of the lower wheel cylinder on the right rear backing plate thereby permitting brake fluid to escape from the braking system. A sudden loss of brake fluid would cause an immediate loss of all braking capacity. It was also noted that two bolts holding the wheel cylinder to the backing plate were bent, the wheel cylinder itself was misaligned, and the backing plate was bent at the point of the bolt holes utilized for attaching the wheel cylinder.

In support of his contention that there was evidence that the brake system was unreasonably dangerous at the time it was sold and delivered by Ford Motor Company, McCamish cites the testimony of the service manager for Blancett Motor Company and the testimony of a service manager of a local Chevrolet dealership. Both men testified that the wheel cylinder was "blown" as a result of extreme pressure being applied in an emergency braking system. In their opinion, this indicated that the brakes had been improperly designed. According to the testimony of other expert witnesses, the failure of the wheel cylinder was attributed to the negligence of Blancett employees in bolting the wheel cylinder to the backing plate. They assumed that the nuts holding the wheel cylinder to the backing plate were not tightened sufficiently. Because the nuts were not tight, abnormal stress was placed on the bolts and the backing plates everytime the brakes were applied. As a consequence, both the bolts and back-

ing plate became bent which resulted in a misalignment of the wheel cylinder. Misalignment of the wheel cylinder would permit a push rod to slip out of the retaining groove on the brake shoe, and there would be nothing to hold the pistons within the wheel cylinder. In his brief, McCamish concedes that the jury found that the employees of Blancett failed to exercise ordinary care in repairing the brake system on the truck.

■ We conclude that McCamish failed to sustain his burden of proving that the truck was unreasonably dangerous at the time it was sold and delivered by Ford Motor Company. This is not a case in which the brake drum had never been pulled, thereby negating the possibility that the braking mechanism had not been disturbed by anyone after the vehicle left the hands of the automobile manufacturer and prior to the accident. See *Hawkeye-Security Ins. Co. v. Ford Motor Company*, Iowa, 174 N.W.2d 672 (1970), second appeal 199 N.W.2d 373 (1972), and *Sharp v. Chrysler Corporation*, Tex.Civ.App., 432 S.W.2d 131 (1968). In this case, the offending wheel cylinder had been removed from the backing plate. The original condition of the cylinder had been extensively modified by the installation of one or more wheel cylinder kits by Blancett Motors only days before the accident. Under such circumstances there can be no inference that the braking system of the truck was unreasonably dangerous at the time it left the hands of Ford Motor Company. See *Quirk v. Ross*, 257 Or. 80, 476 P.2d 559 (1970); *Carroll v. Ford Motor Co.*, Tex.Civ.App., 462 S.W.2d 57 (1970). Taking into consideration the fact that the truck had been used continually for five years and the fact that the portion of the braking system which failed had been repaired and modified shortly before the accident, we conclude that the trial court erred in submitting to the jury the question whether the braking system was unreasonably dangerous "as the result of its design, manufacture or assembly" by Ford. The trial court erred in failing to direct a verdict for Ford Motor Company on this issue. *Cox v. General Motors Corporation*, Ky., 514 S.W.2d 197 (1974); *Midwestern V. W. Corporation v. Ringley*, Ky., 503 S.W.2d 745 (1973); and *Briner v. General Motors Corp., supra.*

## IS FORD MOTOR COMPANY LIABLE FOR FAILING TO GIVE PROPER INSTRUCTIONS CONCERNING THE REPAIR OF THE BRAKING SYSTEM ON THE TRUCK?

McCamish's expert witness, Professor Harry Mason, testified that the Ford Service Manual failed to specify the proper torque pressure for tightening the bolts holding the wheel cylinder to the backing plate. In Mason's opinion, it was important that this information be provided because mechanics frequently fail to tighten bolts to the proper torque rating. Mason was an assistant professor of Mechanical Engineering at the University of Kentucky. Mason's practical experience with brakes was confined to hydraulic braking systems used on manufacturing machinery. He had no experience in the automotive industry and no specific experience involving the design or maintenance of truck braking systems. No other witness testified that an auto mechanic needed to be instructed on the torque rating for wheel cylinder bolts.

■ Ford Motor Company would be under a duty to include in its service manual a specific torque rating for the wheel cylinder bolts only if there were a danger known to Ford which probably would be unknown to persons reasonably anticipated to be performing repairs and service on Ford truck brakes. *Hercules Powder Co. v. Hicks*, Ky., 453 S.W.2d 583, 590 (1970). The torque rating of a bolt refers to the pounds of pressure which must be applied to the bolt to assure that it is tightened properly. Special torque wrenches are used to measure the pounds of pressure being applied to a bolt. In determining whether Ford Motor Company had a duty to instruct Blancett Motors concerning the specific torque pressure to be applied to the wheel cylinder bolts, the testimony of J. C. Blancett, the owner of Blancett Motors, is particularly

relevant. When asked about Professor Mason's testimony concerning torque, Blancett testified:

> Well, I have never known of anybody torquing the bolts in a wheel cylinder.
>
> . . .
>
> But I don't think anybody in this room believes that they should be torqued and if they did I think they would be scared to drive their cars. I think there are millions of cars on the road that haven't been torqued. I think it is a common practice that most every mechanic in the world tould [sic] do to tighten something with a wrench as tight as he thought it could stand without twisting the bolt off. If you've got somebody who doesn't know how to tighten a bolt, I wouldn't call him a mechanic.

No person experienced in the automobile industry indicated that it was necessary to provide an automobile mechanic with a specific torque rating for wheel cylinder bolts.

Professor Mason had no practical experience in the automobile industry. He performed no experiments on wheel cylinder bolts used on F–600 Ford Trucks. Most important, he had no knowledge of the proper torque rating for the wheel cylinder bolts. Standing alone, Professor Mason's testimony did not create a jury issue concerning the adequacy of the Ford Service Manual. The brake system in question had been in use for many years. No new technology was involved in attaching the wheel cylinder to the backing plate. There is nothing to indicate that an experienced automobile mechanic would ever consult a service manual for the purpose of determining how tight the wheel cylinder bolts should be. Without reference to any service manual, the danger inherent in a loose wheel cylinder bolt was obvious.

In *Hiigel v. General Motors Corporation*, Colo., 544 P.2d 983 (1976), the plaintiff purchased a motor home mounted on a truck chassis manufactured by General Motors Corporation. The wheel attachment system of the unit was designed to function only when 75 to 110 foot pounds of torque were applied to the wheel stud bolts. The own-

er's manual contained a schedule for testing torque pressure at specific mileage intervals. However, the owner's manual gave no warning of what would occur if the proper torque pressure were not maintained. If the proper torque pressure were not maintained, it was inevitable that the wheel stud bolts would shear and that the wheels would fall off. On two occasions, the lug bolts on the plaintiff's motor home sheared off because of improper maintenance of torque pressure. The Colorado Supreme Court held that a jury issue was created on the question of the absence of warning in the owner's manual concerning the failure to maintain proper torque pressure. The decision in the *Hiigel* case is clearly distinguishable on two grounds. First, the warning in the *Hiigel* case was directed to the ultimate consumer, rather than automotive mechanics. Second, the evidence clearly established that there were specific critical requirements for torque pressure essential to the safe maintenance of the motor home. The Colorado Supreme Court emphasized that general knowledge that stud nuts must be kept tight did not give the plaintiff knowledge of the specific torque requirements for the lug bolts on the motor home. In the present case, there is no evidence that the wheel cylinder bolts required an unusual torque pressure. There is nothing to indicate that the range of proper torque pressure for the wheel cylinder bolts was so narrow that special procedures were required to apply the proper torque pressure.

For the foregoing reasons, we conclude that the trial court erred in submitting to the jury the question of the adequacy of the service manual or other instruction given to the service employees of Blancett Motor Company. The trial court should have sustained a motion for directed verdict on this issue.

## CROSS–APPEAL

■ On his cross-appeal, McCamish raises three issues, all of which are related to the liability of Blancett Motor Company. McCamish argued that the entire amount of

the verdict should have been assessed against Blancett with Blancett having a right of contribution against Ford Motor Company. The second issue related to the question whether McCamish was entitled to recover the entire amount of the verdict from one defendant in the event that it should be determined that the other defendant was entitled to a directed verdict. Last, McCamish asserts that the verdict rendered at the first trial against Ford should be reinstated in the event that it was held that it was error for the trial court to grant a new trial to McCamish against Blancett. Because Blancett Motor Company's appeal and McCamish's cross-appeal against Blancett were dismissed as settled, the questions raised by the cross-appeal against Ford Motor Company have lost all practical significance. The cross-appeal is moot and should be dismissed. See *Whittle v. W. T. Rawleigh Medical Co.*, 177 Ky. 1, 197 S.W. 470 (1917).

## RULING

In No. 75–593, the judgment of the circuit court is reversed with directions to enter a judgment dismissing McCamish's complaint against the Ford Motor Company. In No. 75–622, the cross-appeal is dismissed.

All concur.